**KESLING v. GENERAL MOTORS CORPORATION.**

**No. 2308.**

District Court, E. D. Missouri, E. D.

June 10, 1946.

2

Lawrence C. Kingsland, Edmund C. Rogers, of Kingsland, Rogers & Ezell, all of St. Louis, Mo., for plaintiff.

Edwin E. Huffman, of St. Louis, Mo. Joseph Q. Stansfield, of New York City, and Edward S. Eveleth, of Detroit, Mich. (Horace Dawson and Edwin S. Booth, both of Chicago, Ill., and W. A. Gebhardt, of South Bend, Ind., of counsel), for defendant.

DUNCAN, District Judge.

This cause having come on for trial before the court upon the pleadings and the evidence adduced, and the court having seen and heard the evidence and having taken the matter under advisement, and being now fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

This is a suit at law for damages, brought by Elmer G. Kesling, a citizen of Missouri, against General Motors Corporation, a corporation of Delaware, having a place of business at St. Louis, Missouri, in this district, the suit charging infringement by General Motors of plaintiff's patent 2,034,400 by the vacuum booster mechanism sold by defendant on its Chevrolet automobiles. Defendant has sold automobiles embodying the accused mechanism in this district.

2. The parties have agreed that plaintiff has title to the patent in suit; and that, if the patent is valid and infringed, the amount of damages shall be at the rate of 12¢ per unit. Defendant's total sales of the accused mechanism aggregate 2,587,384 prior to the 1946 models; so that, if damages are payable, they are agreed to amount to $310,486.08.

3. The claims of plaintiff's patent in suit are numbers 25–29 inclusive.

4. The Kesling patent relates to a vacuum operated mechanism used in shifting automobile transmissions of the selective sliding gear type.

5. The conventional selective sliding gear automobile transmission, as used on most automobiles including the Chevrolet, comprises a group of gears interposed between the clutch of an automobile and the propeller shaft running to the differential and the rear axles. Its purpose is to provide different ratios of engine speed to driving wheels speed.

It conventionally has a driving shaft constantly geared to a countershaft and a reverse shaft, and a driven shaft variably engageable with the driving shaft by engagement of selected gears. There are two selectively movable gears, or gear equivalents. When one of them is moved forward, it makes engagement to establish direct drive between the driving and driven shafts for third or high speed. When it is moved backward, it makes another engagement for establishing second or intermediate speed. This first sliding gear is in axial alignment with the driving and driven shafts, and lends itself to combination with synchronizing clutches that synchronize the speeds of the teeth being meshed, to give easy engagement.

The second slidable gear is moved forwardly to make an engagement with a gear on the countershaft to establish first or low ratio. It is moved backwardly to make engagement with a gear on the reverse shaft to establish reverse speed. These engagements are edge engagements of the sliding gear, with gears on parallel shafts, and they do not have any synchronizing clutches to facilitate the shifting.

In all transmissions of this type, there is a selector mechanism to hold against movement the one of the two sliding gears not being used at the time, and to permit movement of the one selected. There are various ways of doing this.

In all conventional selective sliding gear transmissions, the selection is made by the

movement of the hand lever across the bar of the H. Then the shift of the selected sliding gear is made by drawing the lever along one of the four projections of the legs of the H.

6. For many years automotive engineers had been attempting to find a power shift to perform gear shifting work. Apparently these devices were of doubtful mechanical value and did not attain extensive commercial use. Prior to Kesling, all such patents had taught an art dealing with exclusive power shifting means, and such patents taught control of the power by the actuator rather than of the gears assisted by power.

7. All of the numerous prior art shifters operated on the principle that the hand of the operator should control only a valve mechanism that monitered power to shifter devices. In all cases, from as early as 1912 to as late as the Moorhouse patent of Packard in 1932, this principle was employed. The actual shifting operation was performed entirely by power. Power thus applied was insensitive to the existence or absence of synchronization of the gears being meshed, and tended to force the gears together whether or not they were synchronized. This was likely to cause noise, and damage to gears.

8. In any engagement of sliding gears, there is a critical point occurring at the point of mesh of the gears being engaged. If a sliding gear is brought toward mesh with another gear that is out of synchronism, the edges of the teeth of the two will rattle together with a vibration. If the sliding gear is forced against the other gear, the noise will increase and damage to the mechanism may follow. Only when the gears are substantially synchronized may the engagement be made easily and without noise or damage.

9. Kesling, for the first time introduced a power shifter for sliding gears wherein the hand participated with the power in effecting the shifting. He embodied this in a mechanism having a hand lever, a vacuum power device, valve mechanism to control the power device, and shifter elements. All of the foregoing were known in the art. But Kesling combined these

mechanisms through a composite central mechanism or actuator from which all of the four operating elements radiated and with which they were all connected. This actuator was a composite of members arranged to cause the hand lever and the power device to operate in a timed relationship. In the prior art, the power always led the hand so that there was only a power-produced gear movement at the critical point of mesh. In Kesling, this composite actuator assured that there would be manual domination through the first part of the shift which, in the terms of the art, means up through the point of mesh.

Thus Kesling's shifter by introducing the first shifter wherein the hand participated in the shifting operation afforded control through the first part of the shift up through the point of mesh, was the first to provide a mechanism for power shifting designed to force together unsynchronized gears without attendant noise, or likely to damage the mechanism in forcing together such unsynchronized gears, and yet wherein power could be employed to reduce the actual work or effort of shifting.

10. Underlying the Kesling combination of a central actuator from which the operating elements radiate is the principle that a successful power shifter may be made when the hand controls the operation up to or at the point of mesh. This principle marks a distinct advance from the prior art.

11. The Kesling patent illustrates one embodiment of the Kesling invention, wherein the hand lever, the valve, the power device, and the shifter elements all are grouped about a composite actuator having connections with all of them. In the illustration, the actuator comprises a shaft that is geared to the hand lever shaft, is geared to the power piston, is cammed to the valve mechanism, and is geared to the shifter elements. The arrangement is such that the hand starts a shifting operation by initiating movement of the actuator (as distinguished from the prior art wherein the hand initiates movement of the valve alone). The actuator is connected with the shifter elements so that this initial movement of the actuator results in the application of a manual shifting force to the

gears. In due course, this movement of the actuator, through the connection of the actuator and the valve by the cam arrangement, opens the valve to admit power to assist in the shifting operation. This power is fully introduced in the latter part of the shifting operation—i. e., after point of mesh—so that there is no domination by power of the hand at the critical point.

The construction affords a continuous mechanical connection between the hand of the operator and the gears being shifted. By this, the operator may feel the gears into mesh. By the connection of the hand lever, as well as the power piston and valve to the actuator, the hand may control the shift at point of mesh and prevent a forced engagement of the gears.

Defendant contends, and I am convinced it is true, that the proportion of force exerted by power is about 80%, and the proportion of force exerted by the hand is about 20%. The combined forces of the two bring about movement of the shifter lever. The hand, in operating the shifter lever, is the dominant influence in the operation and without the control by the hand throughout the operation, the operation would not be carried on, i. e., the manual force dominates the mechanical force and whenever the movement of the hand stops, the operation in shifting the gears stops.

12. The real problem involved in the designing of a power shifter is to produce a shifter which efficiently shifts gears while reducing the manual effort required. A shifter would not be acceptable to the public and could not be sold if it did not reduce the hand effort below that of the ordinary manual shifter. Relieving the hand burden is the only reason for using power.

13. The foregoing illustration in the Kesling patent furnishes a basis for Kesling's claims of a novel combination of elements. This combination consists essentially of a hand operating means, a power operating means, a valve control, and shifter elements, all connected to a composite central actuator disposed centrally of the operating group. This combination, regardless of the details of the individual elements, marks a clear departure made by Kesling over the prior art.

14. The accused Chevrolet shifter consists of a hand lever, or shifter lever, a vacuum power device, a valve, shifter elements, and a composite linkage connected to all of them and disposed centrally of the group.

15. In the Chevrolet shifter, the valve and piston arrangement is of the follow-up type wherein an increment of valve movement is followed by an increment of piston movement which closes the valve. In this respect, the Chevrolet power mechanism, as such, differs from that illustrated by Kesling, the latter being a dump-valve operation. Both follow-up types and dump-valve types were known in the act.

16. The composite linkage of Chevrolet includes three levers, all permanently attached together and secured to a shaft. The shaft is connected to the shifter elements. The lever group is connected to the hand lever, the valve, and the piston also. The connections are such that the hand lever is at all times connected to the shifter elements, and affords a continuous mechanical connection between the hand of the operator and the gear being shifted.

17. The Chevrolet shifter affords a manual feel of the gears being meshed, and manual control of the sliding gear up to and at the point of mesh.

Defendant advertised the continuous mechanical connection between the hand and the gear being shifted as important features of its shifter.

18. Chevrolet adopted the principle shown by Kesling, that the hand must do part of the job of shifting in order to have a practical power shifting means. Chevrolet embodied this principle, in the novel combination disclosed by Kesling, of a composite actuator centrally disposed of and connected to the hand lever, the valve, the power piston, and the shifter elements.

19. An "actuator" being something that actuates or puts into action or motion or incites to action, the composite linkage of the Chevrolet shifter is properly termed an "actuator."

20. Defendant contended that the Chevrolet composite linkage includes a valve lever that cannot be included as part of

the actuator. The so-called valve lever is operatively connected not only to the valve, but also to the gear being shifted. It is an essential part of the composite actuator, all of the parts of which inter-operate to provide both power and manual action in making the shift. The valve lever cannot be disconnected from the other links of the actuator without destroying the entire shifter operation.

21. Kesling discloses the central composite actuator in combination with the four actuating elements of this combination wherein the hand controls the first part of the shift. The evidence supports the fact that to the transmission art, the division of a gear engaging operation is at point of mesh. Kesling clearly introduced into the art the manual control of the shift at this point. No shift of the prior art without this feature apparently was mechanically successful. And in this respect Kesling discloses that "feel" would be present at the point of synchronization.

22. Defendant contended that the operations of the elements of the Kesling combination differed from those of the Chevrolet shifter. Such differences as exist are in details of the elements making up the Kesling combination. They largely involve details arising from the use of a follow-up valve system instead of a dumping-valve system. Both systems were known in the art. Selecting one or the other is a choice made after first adopting the Kesling combination. On the level of the Kesling contribution to the art, and the Kesling claims, they are equivalents.

23. The present claims are not limited by the art beyond the obvious meaning of their words. At this level, it is clear that the Chevrolet structure attains the same result—a power-aided shift of sliding gears —by substantially the same means—a composite actuator centrally disposed with respect to the manual means, the power piston, the valve, and the shifter element—the means cooperating in the same way—by providing a continuous manual connection between the hand of the operator and the gear, as well as the valve, so that manual feel and manual control at point of mesh may be had.

24. Defendant contended that the Kesling claims were fully anticipated by the Moorhouse patent No. 1,993,015. This is not true because the Moorhouse patent discloses the old type of full power shift wherein, for all power shifts, the hand merely regulates the valve and does not participate in the work of shifting. Moorhouse does not have the central actuator from which all the four elements emanate to give any partial manual operation.

Furthermore, the Moorhouse patent, defendant's primary reference, was before the patent office in the file of the Kesling patent, and the claims in suit were allowed thereover.

25. Defendant contended that reaction linkage was old, and that it could be added to the Moorhouse structure without invention. The facts are that defendant's alleged reaction linkage was not in the transmission art, but in other arts, the patents referred to being Dewandre No. 1,869,956, Hallett No. 1,755,989, Albinson No. 1,846,017, Berry No. 1,865,817, and Eaton No. 1,938,745. There is no prior art showing of the Kesling combination. It was novel as a combination. It is not anticipated or rendered non-inventive by the presence of one or more elements in one or more different arts. Furthermore, the arts suggested did not present the problems of the transmission art, and clearly did not suggest to workers in that art the possibility that the Kesling combination could be made. Actually, these other patents were owned or controlled by General Motors or Bendix for years without having suggested the combination until after Kesling's disclosure.

26. The prior art emphasizes the long effort of the automotive industry to find a solution to the gear shifting problem. It shows a rather clear borderline. The prior art stopped with the full power shift. Kesling, for the first time, reached forth from the prior art, and by providing partial manual operation, offered a workable shift.

27. Defendant contended that Kesling's patent was a paper patent and should be narrowly construed. The Kesling inven-

tion of the new combination is not limited and should not be limited beyond its true worth in the art. Its worth is fully shown by defendant's use.

28. Defendant contended that the Kesling embodiment of the invention was not a desirable arrangement. This is debatable, but the embodiment is concededly operable, and it will perform the desired function of engaging gears by a combination of manual and power operation. The changes made by Chevrolet are only changes made possible by the initial use of the Kesling novel combination.

29. It was beyond the skill of an ordinary mechanic to produce the new combination made by Kesling.

### Conclusions of Law.

■ I. In interpreting a patent, it is first necessary to determine what contributions, if any, the inventor made to the prior art. Kesling's patent must be interpreted on this level. The prior art, in this case, shows that Kesling made a new combination of elements for shifting gears.

■ II. A patentee need not describe all possible embodiments of his invention, or know all of the principles underlying it. Here, Kesling set forth, in fully adequate terms, an embodiment he preferred, and one that will work. He claimed his invention as a new combination without limitation on the details of the individual elements making up that combination.

■ III. Where a patentee has invented a new combination embodying a new principle of operation, and has claimed that combination without limitations as to the details of the elements making up the combination, infringement results when an accused device embodies the combination regardless of changes or improvements in the details of the individual elements.

■ IV. Infringement results where, and only where, an accused mechanism attains substantially the same result by substantially the same or equivalent means operating and cooperating together in substantially the same way. These substantial identities must always be sought for at the level of the contribution the inventor has made to the art.

■ V. A patent is not limited by file wrapper estoppel where the patentee is not attempting to broaden his claims to eliminate limitations therein, but rather is applying the claims, with all limitations contained in them, to the accused construction.

■ VI. A patent need not be construed by injecting limitations into it to avoid infringement merely because it has not been embodied in commercial devices by the patentee. This is particularly true where the invention relates to an industry requiring such capital as does the automobile industry. Further, the incorporation of an invention into a successful infringing device cannot be overlooked.

■ VII. A novel combination of elements, not theretofore combined in the same way by the prior art, may be patentable, even though specific elements, as such, are disclosed in the art.

■ VIII. Where the elements of a novel combination lay in the art for many years without being combined, and particularly where they were in part owned or controlled by the defendant itself and where the result of combining them was being sought by the industry, the failure to combine them is evidence that the final combination was an inventive art.

■ IX. Where the prior art had been seeking for a successful power shifter for over twenty years, and had failed to find one; where an inventor discovered a new principle that accounts for the failure, and devised a new mechanical combination that affords success, this new combination is inventive and not merely the work of an ordinary mechanic.

■ X. Where the principal prior art relied upon by the defendant was before the patent office during the prosecution of the application for the patent in suit, the presumption of the validity of the patent is substantially strengthened.

■ XI. The Kesling patent No. 2,034,400 as to claims 25-29 inclusive, is valid, and has been infringed by the defendant.

XII. Plaintiff is entitled to his judgment prayed for, including his costs, and his damages in the stipulated amount.